Mary W. SULLIVAN et al., Plaintiffs,

v.

CHASE INVESTMENT SERVICES OF BOSTON, INC., a corporation, et al., Defendants.

No. C–76–1783–CBR.

United States District Court, N. D. California.

March 25, 1977.

Anthony P. David, John Bilyeu Oakley, San Francisco, Cal., for plaintiffs.

Steinhart, Goldberg, Feigenbaum & Ladar, Marvin D. Morgenstein, John Curran Ladd, Eliot S. Jubelirer, San Francisco, Cal., for defendants Chase Investment Services of Boston, Inc.; Phoenix Investment Counsel of Boston, Inc.; Virginia Spencer; Frederick G. Thorne; John P. Chase; Richard A. Spindler.

Dinkelspiel & Dinkelspiel, Bruce W. Belding, San Francisco, Cal., for defendants E. F. Hutton & Company, Inc., and Thomas William Mitchum, Jones and Templeton, Inc., and Harold Harris.

Severson, Werson, Berke & Melchior, Robert L. Lofts, D. Ronald Ryland, San Francisco, Cal., for defendants Monte J. Wallace and Neil W. Wallace.

Arnold & Porter, Richard J. Wertheimer, Paul S. Ryerson, Washington, D.C., McKenna & Fitting, Paul Fitting, Charles G. Miller, San Francisco, Cal., for defendants Sullivan and Worcester, John Hand, and Thomas R. B. Wardell.

Sullivan, Jones & Archer, Richard J. Archer, Lee J. Sclar, San Francisco, Cal., for defendants Dean Witter & Co., Incorporated, and John Gates.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

This is an action against Chase Investment Services of Boston, Inc. ("CIS"), and 27 other defendants, seeking to recover damages for the publishing of allegedly fraudulent and deceptive promotional materials ("brochures") and the making of certain other deceitful statements describing the investment advisory services offered by CIS. Plaintiffs alleged that these misstatements were willfully made with the purpose and result of influencing plaintiffs to employ the services of CIS. Plaintiffs contend that, in addition to various state law violations, defendants have violated the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. ("Exchange Act"); the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 et seq., and the rules and regulations promulgated under the two federal laws.

Plaintiffs, former customers of CIS, seek to represent the class of all "persons who entered into agreements for investment advisory services with defendant CIS during the period from April 1, 1971, to and including May 31, 1973." In addition to CIS, the other defendants consist of two corporations and fourteen individuals alleged to have directly or indirectly "controlled and dominated" the activities of CIS, two employees of CIS, a law firm and two of its attorneys who were legal advisors to CIS, and three individual stockbrokers and their respective employer brokerage houses.

Defendants Monte J. Wallace, Neil W. Wallace, Sullivan & Worcester, John Hand and Thomas R. B. Wardell (hereinafter referred to as "defendants") have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants Monte J. Wallace and Neil W. Wallace are each controlling per-

sons of a parent corporation of CIS[1] and are alleged to have "dominated, controlled, influenced and governed" the activities of CIS at all times relevant to this action. Defendant Sullivan & Worcester is a partnership of attorneys organized and existing under the laws of Massachusetts. Defendants Hand and Wardell are a partner and an associate, respectively, of Sullivan & Worcester and were legal advisors to CIS in the drafting of the promotional materials at issue in this case.

Defendants argue in support of their motion to dismiss that any misconduct which might have taken place in the description of the services or past performance of CIS does not constitute fraudulent or deceitful conduct "in connection with the purchase or sale of any security," as prohibited by § 10(b) of the Exchange Act or Rule 10b–5. Defendants further argue that plaintiffs may not bring a private damage action pursuant to the Investment Advisers Act of 1940 against anyone who is not, himself, an investment advisor.[2]

## I. SECURITIES EXCHANGE ACT OF 1934

Section 10(b) of the Exchange Act forbids the use of any manipulative or deceptive device "in connection with the purchase or sale of any security * * *." 15 U.S.C. § 78j(b). Rule 10b–5 similarly prohibits the employment of "any device, scheme, or artifice to defraud * * * in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The applicability of the Securities Exchange Act of 1934 to the sale of investment advisory services is far from clear. Indeed, six years after the Exchange Act became law, Congress enacted the Investment Advisers Act of 1940 because "[v]irtually no limitations or restrictions exist with respect to the honesty and integrity of individuals who may solicit funds to be controlled, managed, and supervised." S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940).

Plaintiffs' contention that investment advisory services are securities within the meaning of the Exchange Act is unpersuasive. "Security" is defined in § 3 of the Exchange Act.[3] 15 U.S.C. § 78c(a)(10). Congress intended the definition to be broad and general but to encompass the "types of instruments that in our commercial world fall within the ordinary concept of a security." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847–848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975), *quoting* H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933).[4]

The only term in § 3 of the Exchange Act under which the sale of advisory services might conceivably fall is that of

1. Each of these defendants owns 50% of the common stock of defendant W Corporation which in turn owns all of the common stock of defendant Phoenix Investment Counsel of Boston, Inc., which was known as John P. Chase, Inc., and is the successor to the business of a former corporation of the name John P. Chase, Inc. Defendant Phoenix Investment Counsel of Boston, Inc., and John P. Chase, Inc., are referred to collectively as "JPC". JPC owned all of the common stock of CIS.

2. For the purposes of their motions only, defendants assume that there is a private cause of action under the Investment Advisers Act. The Court specifically so finds for the reasons hereinafter set forth.

3. Section 3, in pertinent part, defines a security as

"any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in

any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing * * *." 15 U.S.C. § 78c(a)(10).

4. The definitions of security contained in the 1933 Act and the Exchange Act are, for the purposes of this case, substantially identical. *Compare* 15 U.S.C. § 77b(1) (1933 Act) *with* 15 U.S.C. § 78c(a)(10) (Exchange Act). "[T]he coverage of the two Acts may be considered the same." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975).

"investment contract." Although Congress intended the definition of investment contract to be flexible, *S.E.C. v. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the term is not all-encompassing. " 'The test [for an investment contract] is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' " *Tcherepnin v. Knight*, 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967), *quoting S.E.C. v. Howey Co., supra*, 328 U.S. at 301, 66 S.Ct. 1100.

The Court found an investment contract to exist in *Howey*, because the defendants were "offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by [the defendants]." *S.E.C. v. Howey Co, supra*, 328 U.S. at 299, 66 S.Ct. at 1103. A similar result was warranted in *Tcherepnin*, because plaintiffs were

"participants in a common enterprise—a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings [Association of Chicago] in making sound loans. * * * [T]he petitioners [could] expect a return on their investment only if City Savings show[ed] a profit." 389 U.S. at 338–339, 88 S.Ct. at 554.

In the instant case plaintiffs did not, in effect, buy shares of CIS; their individual fortunes did not ride on the overall success or failure of CIS. Instead, each plaintiff subscribed to the investment service of CIS. The profits depended on the ultimate success or failure of the particular investments made on plaintiffs' behalf by a stockbroker.

■ The purchase of investment advice does not constitute investment in a common enterprise but rather is, at most, use of a common agent. The case at bar closely resembles the facts in *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7 Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). In that case the Court of Appeals for the Seventh Circuit, *per* Stevens, J., held that an individual who, for a fee, invested clients' money in the commodities market was not selling a security within the meaning of the Securities Act of 1933. 15 U.S.C. § 77b(1). The court found that even though the defendant invested the money at his own discretion, the element of commonality necessary to constitute an investment contract was missing:

"Although the complaint does allege that Nelson entered into similar discretionary arrangements with other customers, the success or failure of those other contracts had no direct impact on the profitability of plaintiffs' contract. Nelson's various customers were represented by a common agent, but they were not joint participants in the same investment enterprise." 457 F.2d at 276–277.

*Accord, Stuckey v. duPont Glore Forgan Incorporated*, 59 F.R.D. 129, 131–132 (N.D. Cal.1973).

Plaintiffs argue in the alternative that even if investment advisory services are not a security, fraud in the sale of such services qualifies as fraud in connection with the purchase or sale of other securities. This argument has already been rejected in the Northern District of California. In *Angelakis v. Churchill Management Corp.*, 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,285 at 98,462–98,463 (N.D.Cal.1975) (Williams, J.), the court held that a complaint alleging fraud in the sale of investment advisory services does not state a claim under either § 10(b) or Rule 10b–5:

"Rule 10b–5 requires that actionable fraud be perpetrated in connection with the purchase or sale of a security. This requirement has been interpreted to mean that a plaintiff usually cannot recover unless he or she is the purchaser or seller of a security which is the subject of a fraudulent transaction. [Citations omitted.] Plaintiff does not meet this requirement since the alleged fraudulent activities were made in connection with the execution of an agreement authorizing the management of plaintiff's account * * * ."

■ Plaintiffs' contention is contrary to the well-settled requirements governing who may bring private damage actions under the securities laws. Twenty-five years

ago the Court of Appeals for the Second Circuit held that plaintiffs may bring damage actions for fraud in connection with the sale of securities only if they actually purchased or sold the securities in question.[5] *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463–464 (2 Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). This requirement has been adopted by "virtually all lower courts facing the issue" and, in 1975, by the Supreme Court. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Plaintiffs may not sue under the Exchange Act because the misrepresentations which they allege relate to the nature and quality of the investment service offered by CIS, not to the purchase or sale of any particular security. *Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 747, 749, 95 S.Ct. 1917. Since investment advisory services are not securities, plaintiffs have failed to allege that defendants used fraud or deceit to cause the purchase or sale of any particular security. Therefore, plaintiffs' action under § 10(b) and Rule 10b–5 must be dismissed. *Angelakis v. Churchill Management Corp., supra*, 1975–76 CCH Fed.Sec.L. Rep. at 98,462–98,463; *Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260, 265–267 (S.D.N.Y.1974).

## II. INVESTMENT ADVISERS ACT OF 1940

■ Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, provides, in pertinent part:

"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud any client or prospective client * * *."

Rule 206(4)–1(a), promulgated under the Act provides, in pertinent part:

"(a) It shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Act, for any investment adviser, directly or indirectly, to publish, circulate or distribute any advertisement:

\* \* \* \* \* \*

"(5) Which contains any untrue statement of a material fact, or which is otherwise false or misleading." 17 C.F.R. § 275.206(4)–1(a).

Plaintiffs allege that CIS, an investment advisor, violated § 206 and Rule 206(4)–1, and that the other defendants knowingly aided and abetted and conspired in the violation. Three of the defendants are a law firm and two of its attorneys who advised CIS concerning allegedly deceptive brochures.

The Investment Advisers Act does not explicitly provide for a private cause of action. Thus, before determining whether plaintiffs have stated a claim against all defendants upon which relief can be granted, the Court must resolve each of three questions in the affirmative: (1) Is there an implied right of action under § 206 of the Investment Advisers Act? (2) Does that cause of action extend to individuals who aid and abet a violation of § 206? (3) May attorneys be sued for aiding and abetting a violation of § 206?

### A. *Private Right of Action under § 206*

■ The Investment Advisers Act of 1940 was the last in a series of six statutes enacted by Congress to regulate the trading

---

**5.** Courts often mistakenly refer to this requirement as one of "standing." *E. g., Mount Clemens Industries, Inc. v. Bell*, 464 F.2d 339, 342–343 & n. 6 (9 Cir. 1972); *Angelakis v. Churchill Management Corp.*, 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,285 at 98,463 (N.D.Cal. 1975). Standing in the constitutional sense, requires that a plaintiff have "a sufficient stake in an otherwise justiciable controversy * * *." *Sierra Club v. Morton*, 405 U.S. 727,

731–732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). The *Birnbaum* rule does not confer or restrict standing; it merely limits the class of potentially damaged plaintiffs who may recover damages in private actions under Rule 10b–5. *See Lank v. New York Stock Exchange*, 548 F.2d 61, at 63–64 (2 Cir. 1977) (requirements for stating a claim for relief under § 6 of the Exchange Act, 15 U.S.C. § 78f, differ from those for standing to sue under that section).

and management of securities.[6] Like the antifraud provisions in the Exchange Act, § 206 does not explicitly provide that a private party may bring a damage action against one who violates the section. In contrast to §§ 10(b) and 14 of the Exchange Act, however, courts are split on the question of whether a private right of action should be implied under § 206.[7]

Neither § 10(b) nor Rule 10b–5 explicitly provides for a private civil action to recover damages for its violation. Nor is there any indication that in creating these provisions Congress or the Securities and Exchange Commission ("SEC") even considered the question of such civil damage actions. *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 729–730, 95 S.Ct. 1917. In 1946, however, the United States District Court for the Eastern District of Pennsylvania held an implied right of action to exist under Rule 10b–5, *Kardon v. National Gypsum Co.,* 69 F.Supp. 512, 514 (E.D.Pa.1946), and other courts soon followed suit. In fact, by the time the Supreme Court finally recognized the existence of such a private damage action in *Supt. of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), there was near unanimity in the lower federal courts. *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 730, 95 S.Ct. 1917. There is also little doubt that individuals may recover damages for violation of § 14 of the Exchange Act. *See J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (§ 14(a)); *Smallwood v. Pearl Brewing Company,* 489 F.2d 579, 596 n. 20 (5 Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) (§ 14(c)).

No circuit court has ruled on the question of whether a private right of action may be implied under the Investment Advisers Act. In *Brouk v. Managed Funds, Inc.,* 286 F.2d 901 (8 Cir. 1961), *vacated as moot,* 369 U.S. 424, 82 S.Ct. 878, 8 L.Ed.2d 6 (1962), the Court of Appeals for the Eighth Circuit held that neither the Investment Advisers Act nor the Investment Company Act, 15 U.S.C. § 80a–1 *et seq.,* creates any statutory duty for directors of an investment company, the violation of which would give rise to a federal private cause of action. *Brouk* has little precedential value, however, both because it was vacated by the Supreme Court with an order that the cause of action be dismissed and because the holding was strongly criticized in a subsequent Eight Circuit decision.[8] *See Greater Iowa Corporation v. McLendon,* 378 F.2d 783, 793 (8

---

**6.** The other five acts were the Investment Company Act of 1940, c. 686, Title I, 54 Stat. 789 (codified at 15 U.S.C. § 80a–1 *et seq.*); the Trust Indenture Act of 1939, c. 411, 53 Stat. 1149 (codified at 15 U.S.C. § 77aaa *et seq.*); the Public Utility Holding Act of 1935, c. 687, Title I, 49 Stat. 803 (codified at 15 U.S.C. § 79 *et seq.*); the Securities Exchange Act of 1934, c. 404, 48 Stat. 881 (codified at 15 U.S.C. § 78a *et seq.*); and the Securities Act of 1933, c. 38, Title I, 48 Stat. 74 (codified at 15 U.S.C. § 77a *et seq.*). See Loomis, "The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940," 28 *Geo.Wash.L.Rev.* 214 (1959).

**7.** Courts disagree as to whether a private right of action for damages exists under § 17(a) of the 1933 Act. *Compare B & B Inv. Club v. Kleinert's, Inc.,* 391 F.Supp. 720, 726 (E.D.Pa. 1975); *Dorfman v. First Boston Corp.,* 336 F.Supp. 1089, 1096 (E.D.Pa.1972) (damage action may be maintained), *with Reid v. Mann,* 381 F.Supp. 525, 526–528 (N.D.Ill.1974); *Ferland v. Orange Groves of Florida, Inc.,* 377 F.Supp. 690, 706 (M.D.Fla.1974) (no private right of action for damages). *See Tri-County*

State Bank v. Hertz, 418 F.Supp. 332, 338 n. 4 (M.D.Pa.1976).

**8.** In *Brown v. Bullock,* 294 F.2d 415, 421–422 (2 Cir. 1961) (*en banc*), the Court of Appeals for the Second Circuit disagreed with the holding in *Brouk* as to the Investment Company Act. In 1970, Congress amended the Investment Company Act to provide specifically for a private right of action against investment company directors who violate their fiduciary duties. Act of December 14, 1970, Pub.L. No. 91–547, § 20, 84 Stat. 1428 (1970) (codified at 15 U.S.C. § 80a–35). It is now well settled that private parties may sue under other sections of the Investment Company Act as well. *See e. g., Moses v. Burgin,* 445 F.2d 369, 373 (1 Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); *Herpich v. Wallace,* 430 F.2d 792, 815 (5 Cir. 1970); *Esplin v. Hirschi,* 402 F.2d 94, 103 (10 Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *Taussig v. Wellington Fund, Inc.,* 313 F.2d 472, 476 (3 Cir.), *cert. denied,* 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963).

Cir. 1967). The Court of Appeals for the Second Circuit is currently considering whether a private right of action may be implied under the Act but has not yet rendered a decision. *See Abrahamson v. Fleschner*, 537 F.2d 27, 28 (2 Cir. 1975).[9]

The district courts that have considered the question are split.[10] To date, the decision in *Bolger v. Laventhol, Krekstein, Horwath & Horwath, supra*, 381 F.Supp. 260, most thoroughly considers the issue. Relying upon the Supreme Court's decisions in *J. I. Case Co. v. Borak, supra*, 377 U.S. 426, 84 S.Ct. 1555, and *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974), the court in *Bolger* held that a private right of recovery should be implied under § 206 of the Act. The court found that such a private cause of action would further the broad remedial purposes of the Act and would not be inconsistent with legislative intent. *Bolger v. Laventhol, Krekstein, Horwath & Horwath, supra*, 381 F.Supp. at 262–265.

A year after the decision in *Bolger*, the Supreme Court considered whether a private cause of action for damages against corporate directors should be implied under 18 U.S.C. § 610, a criminal statute prohibiting corporations from contributing to presidential campaigns. *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In refusing to imply such an action, the Court set out a four-part test for determining whether a private cause of action should be implied under an Act of Congress:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

Applying the test of *Cort v. Ash*, this Court must conclude that individuals who have employed the services of an investment adviser and who have been injured by a violation of § 206 have an implied private right of action for damages under the Investment Advisers Act.[11]

### 1. Plaintiff Class

█ The Supreme Court makes it clear in *Cort v. Ash* that a plaintiff needs more than mere standing to be allowed an implied right of action under a statute. Congress must have enacted the statute for the "especial benefit" of the plaintiff class. The Court refused to imply a private right of action under 18 U.S.C. § 610 because that section was not enacted for the especial

---

**9.** After this opinion was drafted, the Court of Appeals for the Second Circuit decided *Abrahamson*, holding, with one judge dissenting, that an implied private right of action exists under § 206. *Abrahamson v. Fleschner*, No. 75–7203 (2 Cir. February 25, 1977).

**10.** *Compare The Fund of Funds, Ltd. v. Vesco*, CCH Fed.Sec.L.Rep. ¶ 95,644, at 90,197–90,198 (S.D.N.Y.1976); *Anqelakis v. Churchill Management Corp.*, 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,285 at 98,464 (N.D.Cal.1975); *Jones v. Equitable Life Assurance Society of U.S.*, 409 F.Supp. 370, 372 (S.D.N.Y.1975); *Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260, 262–265 (S.D.N.Y.1974) (implied

right of action), *with Gammage v. Roberts, Scott & Co.*, 1974–75 CCH Fed.Sec.L.Rep. ¶ 94,761 (S.D.Cal.1974); *Greenspan v. Del Toro*, 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,488 (S.D.Fla.1974) (no implied right of action).

**11.** This question is carefully analyzed in Note, "Private Causes of Action Under Section 206 of the Investment Advisers Act," 74 *Mich.L.Rev.* 308 (1975). The author considers § 206 in light of the analysis in *Cort v. Ash* and concludes that a private right of action should be implied under the section.

benefit of corporate stockholders. The primary purpose of the statute was to destroy "the influence over elections which corporations exercised through financial contribution." *Cort v. Ash, supra*, 422 U.S. at 80, 82, 95 S.Ct. at 2089. "[P]rotection of ordinary stockholders was at best a secondary concern." 422 U.S. at 81, 95 S.Ct. at 2089.

The Supreme Court most recently emphasized the importance of the especial benefit test in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). In that case the Court refused to imply a private damage action under § 14(e) of the Exchange Act, 15 U.S.C. § 78n(e) ("Williams Act"), on behalf of an unsuccessful tender offeror because such a plaintiff "is not one 'for whose *especial* benefit the statute was enacted.'" 97 S.Ct. at 947, *quoting Cort v. Ash, supra*, 422 U.S. at 78, 95 S.Ct. 2080. In so holding, the Court carefully examined the legislative history of the Williams Act and concluded that Congress intended the statute to protect shareholder-offerees, not other tender offerors.

In contrast, Congress enacted the Investment Advisers Act explicitly for the protection of those who employ investment advisory services:

"The essential purpose of [the Act] is to protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts * * *." H.R.Rep. No. 2639, 76th Cong., 3d Sess. 28 (1940).

"[T]he dangerous potentialities of stock market tipsters imposing upon unsophisticated investors, convinces this committee that protection of investors requires the regulation of investment advisors on a national scale." S.Rep. No. 1775, *supra*, at 21.

 Congress's goal of protecting investors who employ investment advisers closely parallels the purpose of other securities legislation under which private rights of action have been implied. For example, in *J. I. Case Co. v. Borak, supra*, 377 U.S. 426, 84

S.Ct. 1555 the Supreme Court held that stockholders who are injured by false and misleading proxy statements in violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), may sue for damages. As the Court points out in *Cort v. Ash, supra*, 422 U.S. at 82, 95 S.Ct. at 2090, the result in *J. I. Case Co.* was justified because § 14(a) is part of "a pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard * * *." Section 206 serves the same function. The Investment Advisers Act, like § 14(a), is for "the protection of investors." *J. I. Case Co. v. Borak, supra*, 377 U.S. at 432, 84 S.Ct. 1555. *Cf. Texas & Pacific Ry. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 60 L.Ed. 874 (1916) (implied right of action for railroad workman injured from violation of penal section of railroad safety statute enacted for protection of railway workers).

### 2. *Congressional Intent*

The second element to consider is whether Congress intended to create or prohibit a private right of action. For example, in *National Railroad Passenger Corp. v. National Association of Railroad Passengers, supra*, 414 U.S. at 458–461, 94 S.Ct. 690, the Supreme Court placed great weight on the fact that a provision allowing private actions under the act in question was discussed in hearings and deleted before enactment of the measure. There is no evidence in the legislative history of the Investment Advisers Act, however, to indicate that Congress even considered creating a private right of action.

At first blush, § 214, 15 U.S.C. § 80b–14, appears to evince a congressional intent not to allow private damage actions under the Act. That section gives federal district courts jurisdiction over "violations of this subchapter * * * [and] all suits in equity to enjoin any violation of this subchapter * * * ." [12] Noticeably absent is a provi-

---

12. Section 214 provides, in pertinent part:
 "The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of

the United States shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, of

sion granting jurisdiction over actions at law. This omission takes on special significance because, in *J. I. Case Co. v. Borak, supra,* 377 U.S. at 431, 84 S.Ct. 1555, the Supreme Court noted the existence of such a provision in the Exchange Act as evidence that Congress intended to allow private damage actions under that statute. Moreover, each of the other major securities acts, including the Investment Company Act, provides that federal courts shall have jurisdiction over "actions at law brought to enforce any liability or duty" created by the particular act.[13] Indeed, citing the failure of Congress to include actions at law in § 214, the court in *Greenspan v. Del Toro,* 1975–76 CCH Fed.Sec.L.Rep. ¶ 95,488 (S.D. Fla.1974), dismissed an action for damages under the Act.

While the court in *Greenspan* was mistaken in concluding that the absence of such a specific provision denied it jurisdiction,[14] the wording of § 214 could well be an indication of congressional intent not to allow private damage actions. An examination of the legislative history of § 214, however, shows that no such intent can be inferred.

The Investment Company Act and the Investment Advisers Act were introduced in the House and Senate on March 14, 1940, as parts I and II of substantially identical bills. *See* S. 3580, 76th Cong., 3d Sess. (1940); H.R. 8935, 76th Cong., 3d Sess. (1940). The proposed Investment Company Act was the far more detailed of the two, and much of the investment adviser bill was merely an incorporation by reference of provisions of the proposed Investment Company Act. *See* S. 3580, *supra,* at § 203. Section 40 of the proposed Investment Company Act incorporated by reference the jurisdictional provision of the Public Utility Holding Company Act of 1935, and the pro-

posed Investment Advisers Act, in turn, incorporated § 40. Section 25 of the Public Utility Holding Company Act provided jurisdiction over "all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation" of, the Act. 15 U.S.C. § 79y.

The jurisdictional provisions of the two proposals remained identical until May 24, 1940, when § 213 appeared in a Confidential Committee Print without the "actions at law" language. As enacted, the jurisdictional provisions of the Investment Company Act and the Investment Advisers Act are almost identical to § 25 of the Public Utility Holding Company Act, except that § 214 of the Investment Advisers Act does not mention actions at law.

There is no evidence that Congress intended § 214 to indicate disapproval of private damage actions under the Investment Advisers Act. The only reference to § 214 in the legislative history appears in a general comment concerning §§ 208–221, inclusive: "These sections contain provisions comparable to those in [the Investment Company Act]." H.R.Rep. No. 2639, *supra,* at 30. *See* S.Rep. No. 1775, *supra,* at 22. Had Congress attached any significance to this difference in language, it surely would have said so.

The reason the Investment Company Act contains an "actions at law" provision while the Investment Advisers Act does not, may be explained by looking at the statutes themselves. Section 30(f) of the Investment Company Act provides that officers, directors, and certain other individuals connected with investment companies

"shall in respect of his transactions in any securities of such company * * * be subject to the *same duties and liabilities as those imposed by section 16 of the Securities Exchange Act of 1934* upon

---

all suits in equity to enjoin any violation of this subchapter or the rules, regulations, or orders thereunder." 15 U.S.C. § 80b–14.

**13.** Investment Company Act of 1940, 15 U.S.C. § 80a–43; Public Utility Holding Company Act of 1935, 15 U.S.C. § 79y; Securities Exchange Act of 1934, 15 U.S.C. § 78aa; Securities Act of

1933, 15 U.S.C. § 77v(a). *See* Trust Indenture Act of 1939, 15 U.S.C. § 77vvv(b).

**14.** Even without a specific grant of jurisdiction, federal district courts would have jurisdiction over this action because it "arises under" a law of the United States and involves more than $10,000. 28 U.S.C. § 1331.

certain beneficial owners, directors, and officers in respect of their transactions in certain equity securities." 54 Stat. 836 (codified at 15 U.S.C. § 80a–29(f)) (emphasis supplied).

Section 16(b) of the Exchange Act provides, in pertinent part:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him * * * shall inure to and be recoverable by the issuer * * *. *Suit to recover such profit may be instituted at law or in equity* in any court of competent jurisdiction * * *." 15 U.S.C. § 78p(b) (emphasis supplied).

The "actions at law" referred to in § 40 are to enforce the "duties and liabilities" created in § 30(f). In fact, each of the other securities laws which provides for jurisdiction over actions at law, also explicitly creates certain "duties and liabilities" which may be enforced by a private damage action.[15]

■ There was no reason to include the "actions at law" language in § 214, because Congress did not include any explicit private damage provision in the Investment Advisers Act. Thus, § 214 casts no light on whether Congress would have approved or disapproved of an implied private right of action under § 206.[16] Indeed, § 215, 15 U.S.C. § 80b–15, which provides that any contract made in violation of the Act shall be void, makes it clear that Congress intended private individuals to seek at least some form of private remedy under the Act. Indeed, courts have relied on similar provisions in the Exchange Act and the Public Utility Holding Company Act to justify implication of private actions for damages under other provisions of those statutes. *E. g., Fischman v. Raytheon Mfg. Co.,* 188 F.2d 783, 787 n. 4 (2 Cir. 1951) (§ 29(b) of Exchange Act, 15 U.S.C. § 78cc(b)); *Goldstein v. Groesbeck,* 142 F.2d 422, 426–427 (2 Cir. 1944) (§ 26 of Utility Holding Company Act, 15 U.S.C. § 79z(b)); *Brown v. Bullock,* 194 F.Supp. 207, 225–226 (S.D.N.Y.), *aff'd en banc,* 294 F.2d 415 (2 Cir. 1961) (§ 47(b) of Investment Company Act, 15 U.S.C. § 80a–46(b)); *Kardon v. National Gypsum Co., supra,* 69 F.Supp. at 514 (§ 29(b) of Exchange Act). *See Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 735, 95 S.Ct. 1917.

### 3. *Legislative Purpose*

In the absence of clear evidence of congressional intent, the Court must decide whether implying a private cause of action would be consistent with the underlying purpose of the Investment Advisers Act.[17] The Act was passed in 1940 in response to a detailed study by the SEC of the activities

---

**15.** E. g., Section 323(a) of the Trust Indenture Act of 1939, 15 U.S.C. § 77www(a); §§ 16(a), 17(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79p(a), 79q(b); §§ 9(e), 18 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(e), 78r; and §§ 11, 12 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l.

**16.** The explicit provision for private actions to recover for certain wrongs under other securities laws does not mean that Congress's failure to so provide in the Investment Advisers Act should be interpreted as disapproval of any implied private action. Such variations, even within the same act, are of little significance. *Cort v. Ash,* 422 U.S. 66, 82–83 n. 14, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). For example, private damage actions have been implied under §§ 10(b) and 14 of the Exchange Act even though those sections do not explicitly provide for a private right of action, and §§ 9(e), 16(b), and 18 explicitly do. *Compare* 15 U.S.C. §§ 78j(b), 78n *with* 15 U.S.C. §§ 78i(e), 78p(b), 78r.

**17.** Although the Supreme Court applies the *Cort v. Ash* test in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 37–39, 97 S.Ct. 926, 947–948 (1977), it appears to require a new and more stringent standard of conformance to legislative purpose. Rather than merely inquiring whether a private right of action would be "consistent" with a statute's underlying legislative purpose, the Court analyzed the problem in terms of whether an implied right of action "is *necessary* to effectuate Congress' goals." 97 S.Ct. at 941 (emphasis supplied). Whichever standard is applicable, this Court finds that an implied cause of action is both consistent with and necessary to achieving Congress's underlying purpose in enacting the Investment Advisers Act.

of investment companies and trusts. The SEC Report, H.R.Doc. No. 477, 76th Cong., 2d Sess. (1939), which was "authorized and directed" by the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79z–4, detailed the widespread problems and abuses in the industry and concluded that only federal legislation could provide an effective solution. S.Rep. No. 1775, *supra*, at 21.

As previously discussed, the primary purpose of the Investment Advisers Act was to protect the investing public. Congress enacted the Investment Advisers Act at the same time and for the same reasons as the Investment Company Act. Courts have relied upon the protective purpose of the Investment Company Act to justify the implication of private actions under that statute. *See* cases collected at n. 8, *supra*. It would be anomalous, indeed, to find private damage actions consistent with the purpose of one act and not the other.

The same considerations that prompted the Supreme Court to imply a cause of action under § 14(a) of the Exchange Act in *J. I. Case Co. v. Borak, supra,* 377 U.S. 426, 84 S.Ct. 1555, apply with equal force as to private actions under § 206. Two of the Court's primary considerations in *Borak* were that § 14(a) was intended "for the protection of investors" and that private suits would greatly aid SEC enforcement of the statute. 377 U.S. at 432, 84 S.Ct. 1555.

Not only does § 206 have the same protective purpose as § 14(a), but the existence of private actions will significantly increase the statute's effectiveness. As of December 31, 1976, 4,328 investment advisers were registered with the SEC—a 26% increase over the number registered at the end of fiscal year 1975. *See* Letter from Wilson Butler, Assistant Director, SEC Office of Reports and Information Services (Feb. 16, 1977) (filed Feb. 22, 1977); *Annual Report of the SEC for the Fiscal Year Ended June 30, 1975,* at 127 (1976). In addition to policing investment advisers whose advice affects many millions of dollars of investments, the SEC must also oversee the approximately 1,300 investment companies that control over $74,000,000,000 in assets.

In response to this tremendous burden, the SEC has proposed legislation to clarify the existence of a private damage action under the Investment Advisers Act and has supported the implication of such an action by the courts. *See* BNA Sec.Reg. & L.Rep., No. 332, at E–1, E–7 (Dec. 17, 1975) ("SEC Proposal"); Brief of the Securities and Exchange Commission, Amicus Curiae, *Abrahamson v. Fleschner,* C–75–7203 (2 Cir., filed Feb. 2, 1976) ("Amicus Brief"). The SEC believes that private suits would be "a valuable adjunct to Commission enforcement," SEC Proposal, *supra,* at E–7, supplementing the Commission's limited resources, while "not interfer[ing] with the Commission's administration of [the] Act * * *." Amicus Brief, *supra,* at 26. *See* Note, *supra,* note 11, 74 *Mich.L.Rev.* at 323; "Report of the Securities and Exchange Commission on the Public Policy Implications of Investment Company Growth," H.R.Rep. No. 2337, 89th Cong., 2d Sess. 343–346 (1966); S.Rep. No. 1760, 86th Cong., 2d Sess. 4 (1960).

Finally, private damage actions may be the only way injured investors can recover money they have lost to dishonest investment advisers. Federal courts have a duty "to provide such remedies as are necessary to make effective the congressional purpose" of a statute. *J. I. Case Co. v. Borak, supra,* 377 U.S. at 433, 84 S.Ct. at 1560. Implying a private cause of action under the Investment Advisers Act is eminently consistent with the Act's underlying purposes and is necessary to effectuate properly Congress's goals. As the Supreme Court emphasized in *S.E.C. v. Capital Gains Bureau,* 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963):

"Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes." (Footnote omitted.)

### 4. Applicable State Law

The Supreme Court refused to imply a federal private damage action for election law violations in *Cort v. Ash* because doing so "would intrude into an area traditionally committed to state law without aiding the main purpose of [18 U.S.C.] § 610 * *." *Cort v. Ash, supra,* 422 U.S. at 85, 95 S.Ct. at 2091. The Court contrasted § 610 with § 14(a) of the Exchange Act, a vital part of an overall pervasive federal scheme for regulating the securities industry, which is "clearly an intrusion of federal law into the internal affairs of corporations * * *." *Id.*

Implication of a federal private cause of action here will not invade the province of state law. Congress unquestionably intended the Investment Advisers Act to provide "regulation of investment advisers on a national scale." S.Rep. No. 1775, *supra,* at 21. "[T]he solution of the problems and abuses of investment advisory services * * * cannot be effected without Federal legislation." *Id.* Moreover, regulation of investment advisers is not an area traditionally committed to state law. Although 27 states now have anti-fraud statutes regulating investment advisers, most were enacted well after 1940, and only one provides for a private cause of action. *See* H.R.Doc. No. 477, *supra,* at 31–33; Note, *supra,* note 11, 74 Mich.L.Rev. at 324 & n. 103 (state statutes collected).

### B. Liability of Aiders and Abettors

Plaintiffs allege that moving defendants, none of whom is an investment adviser, knowingly aided and abetted the violation of § 206 by CIS. Given that a violation of § 206 constitutes tortious conduct for which plaintiffs may recover, defendants would normally also be liable for damages as aiders and abettors. *Restatement of Torts* § 876 (1939) provides, in pertinent part:

"For harm resulting to a third person from the tortious conduct of another, a person is·liable if he

\* \* \* \* \* \*

"(b) knows that the other's. conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, * *."

Citing the *Restatement* and the remedial purpose of the securities laws against fraud, courts routinely have recognized the right of plaintiffs to recover damages from those who aid and abet violations of §§ 10(b) and 14 of the Exchange Act.[18]

Defendants, however, contend that even if a private right of action lies against investment advisers who violate § 206, plaintiffs may not bring such a damage action against individuals who are not investment advisers. Section 206 makes it "unlawful for *any investment adviser* * * to employ any device, scheme, or artifice to defraud any client or prospective client

---

18. *E. g., Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 779–781 (3 Cir. 1976) (§ 14(a)); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 886–889 (3 Cir.), *cert. denied,* 420 U.S. 908, 96 S.Ct. 2005, 48 L.Ed.2d 817 (1975) (§ 10(b)); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–97 (5 Cir. 1975) (§ 10(b)); *see Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (§ 14(e), if plaintiff part of class Congress intended statute to protect); *Strong v. France,* 474 F.2d 747, 752 (9 Cir. 1973) (§ 10(b)); 2 Bromberg, *Securities Law*: Fraud § 8.5 (530) (1975); Ruder, "Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution," 120 U.Pa.L.Rev. 597, 620–645 (1972).

The main concern in these cases has not been whether a cause of action exists against aiders and abettors, but whether and to what extent

scienter is required. The Supreme Court recently reversed a decision of the Seventh Circuit Court of Appeals which had allowed an alleged 10b–5 aider and abettor to be sued on a theory of negligence. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *rev'g,* 503 F.2d 1100 (7 Cir. 1974). In holding that negligence alone will not constitute a violation of § 10b–5, the Court declined to "consider whether civil liability for aiding and abetting is appropriate under the section and the Rule [or] the elements necessary to establish such a cause of action." 425 U.S. at 191–192 n. 7, 96 S.Ct. at 1380. The necessity of scienter is not at issue in this motion to dismiss because plaintiffs have alleged that defendants had knowledge that the statements in question were false.

* * *." (Emphasis supplied.) Defendants argue that since only an investment adviser can violate § 206, only an investment adviser may be sued for damages in an implied action arising under the section.

Defendants recognize the liability of individuals who have aided and abetted violations of §§ 10(b) and 14 of the Exchange Act, but they attempt to distinguish those provisions from § 206. Defendants point out that §§ 10(b) and 14 are addressed to "any person," [19] while § 206 proscribes conduct by investment advisers only. Moreover, the Investment Advisers Act itself clearly defines and differentiates among "investment advisers," "persons," and "persons associated with an investment adviser." *See* 15 U.S.C. § 80b–2(11), (16), (17). In marked contrast to § 206, other provisions of the Act apply to all persons. For example, § 207, 15 U.S.C. § 80b–7, makes it "unlawful for *any person* willfully to make any untrue statement of a material fact in any registration application * * *." (Emphasis supplied.)

Defendants' argument is superficially appealing. At least one court has accepted it, holding that "[s]ince [§ 206] applies only to 'investment advisers', only such persons should be amenable to suit." *Greenspan v. Del Toro, supra,* 1975–76 CCH Fed.Sec.L. Rep. ¶ 95,488 at 99,460. Further analysis, however, indicates that Congress was concerned with the activities of third parties who aid investment advisers in violating the Act. Moreover, refusal to allow private remedies against such aiders and abettors would be contrary to the broad and flexible interpretation that should be given to such remedial legislation.

It is true that Congress did not specifically provide that aiding and abetting a breach of § 206 would be a separate violation of the Investment Advisers Act. There was no reason to do so, however, because in 1940, aiding and abetting a federal criminal violation was automatically a separate and distinct crime. 18 U.S.C. § 550 (1940) (now 18 U.S.C. § 2 (1970)). *Cf. United States v. Brashier,* 548 F.2d 1315, at 1322 (9 Cir. 1976); *United States v. Deutsch,* 451 F.2d 98, 103 (2 Cir. 1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 677 (1972) (defendants convicted of aiding and abetting violation of Investment Company Act of 1940).

If congressional intent regarding aiders and abettors was unclear in 1940, Congress clearly demonstrated its concern when it amended the Investment Advisers Act in 1960. Pub.L. No. 86–750, 74 Stat. 885 (1960).[20] Congress enacted the 1960 amendments at the request of the SEC to help strengthen the effectiveness of the statute, which had been criticized as being no more than "a continuing census of the Nation's investment advisers." S.Rep. No. 1760, 86th Cong., 2d Sess 2 (1960). *See* H.R.Rep. No. 2179, 86th Cong., 2d Sess. 3–4 (1960), U.S.Code Cong. & Admin.News 1960, p. 3503. The amendments, which were introduced in the House and Senate in substantially the same form,[21] strengthened enforcement of the Act in a number of ways, but the provisions dealing with aiders and abettors are most instructive in this case.

Section 209(e) of the 1940 Act empowered the SEC to enjoin "any person [who] has engaged or is about to engage in any act or practice constituting a violation of" the Act or any regulation thereunder. Investment Advisers Act of 1940, *supra,* § 209(e), 54 Stat. 854. The House Committee on Interstate and Foreign Commerce was concerned that

---

19. Sections 10(b), 14(a), and 14(e) of the Exchange Act provide: "It shall be unlawful for any person" to engage in the proscribed conduct. 15 U.S.C. §§ 78j(b), 78n(a), 78n(e).

20. While the intent of the 86th Congress cannot be attributed to the 76th Congress, *S.E.C. v. Capital Gains Bureau,* 375 U.S. 180, 199–200 (1964), a private right of action against aiders and abettors can be implied from the 1960

amendment itself. In any event, the Court also implies such an action from the 1940 Act itself for the same reasons that a damage action should be implied against investment advisers. The Court must conclude that Congress was well aware in 1940 that aiding and abetting a violation of § 206 was also illegal.

21. S. 3773, 86th Cong., 2d Sess. (1960); H.R. 2482, 86th Cong., 2d Sess. (1960).

"in the absence of any express statutory provision, there may exist some doubt as to the Commission's authority to obtain an injunction, or to impose administrative sanctions, against persons aiding or abetting violations of the act." H.R.Rep. No. 2179, *supra,* at 8.

As a result, § 11 of H.R. 2482 expressly made it "unlawful for any person to aid, abet, counsel, command, induce, or procure the violation of any provision of this title * * * by any other person." Lest there be any mistake, the Committee specified that this provision "does not in any manner constitute a limitation with respect to the applicability in criminal proceedings of [18 U.S.C. § 2] * * *." H.R.Rep. No. 2179, *supra,* at 8.

The Senate Committee on Banking and Currency also wanted to "make it clear that the Commission may obtain an injunction against any person who is aiding, abetting, or inducing another person to violate the act." S.Rep. No. 1760, *supra,* at 8, U.S.Code Cong. & Admin.News 1960, p. 3510. The Committee was well aware of 18 U.S.C. § 2. *See id.* at 8–9. Rather than unnecessarily repeating in § 208 that aiding and abetting a criminal act is also a crime, S. 3773, which was eventually enacted, amended § 209 to explicitly provide the SEC with power to enjoin aiders and abettors.[22] The Senate Committee was careful to emphasize, however, that the proposed amendment "does not limit the application of the criminal aiding and abetting statute of the United States Code (18 U.S.C. 2)." S.Rep. No. 1760, *supra,* at 8–9, U.S.Code Cong. & Admin.News 1960, p. 3510.

In short, defendants simply are wrong in their assertion that Congress did not intend to prohibit the aiding and abetting of § 206

violations. Not only was Congress well aware that such acts would be illegal, but it amended the Act to insure that aiding and abetting could be enjoined as well as prosecuted. As the Senate Committee summed up the purpose of the 1960 amendment to § 209:

"[T]he amendment borrows the concepts of aiding and abetting from the criminal law and seeks to insure that persons will be liable in administrative actions by the Commission, as well as in criminal actions." S.Rep. No. 1760, *supra,* at 9, U.S. Code Cong. & Admin.News 1960, p. 3510.

The court in *Bolger v. Laventhol, Krekstein, Horwath & Horwath, supra,* 381 F.Supp. at 268, specifically rejected the argument that no private action may lie against aiders and abettors because they are not specifically mentioned in § 206:

"Such a pedantic and technical reading of the statute is inconsistent not only with the Act's patent legislative intent, but also with the remedial purposes of the doctrine of implied remedies * * *.

" * * * To deny to these investors, who were injured by this combined fraudulent conduct, a cause of action against all of the wrongdoers would leave the plaintiffs with half a remedy * * *." (Citations omitted.)

*Accord, The Fund of Funds, Ltd. v. Vesco,* CCH Fed.Sec.L.Rep. ¶ 95,644 (S.D.N.Y. 1976).

Recent court decisions interpreting § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2), exemplify the policy of liberally construing the scope of private remedies for fraud under the securities laws. Section 12(2) provides, in pertinent part:

"Any person who—

* * * * * *

"(2) offers or sells a security * * * by means of a prospectus or oral com-

---

**22.** Section 209(e), as amended, provides in pertinent part:

"Whenever it shall appear to the Commission that any person has engaged, is engaged, or is about to engage in any act or practice constituting a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, or that any person has aided, abetted, counseled, commanded, induced, or procured, is aiding, abetting, counseling, commanding, inducing, or procuring, or is about to

aid, abet, counsel, command, induce, or procure such a violation, it may in its discretion bring an action in the proper district court of the United States * * *. Upon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice, or in aiding, abetting, counseling, commanding, inducing, or procuring any such act or practice, a permanent or temporary injunction or decree or restraining order shall be granted without bond." 15 U.S.C. § 80b–9(e).

munication, which includes an untrue statement of a material fact * * *, shall be liable to the person purchasing such security from him * * *."

Although, on its face, the section applies only to an individual who "offers or sells" securities, most courts have allowed aiders and abettors to be sued for its violation.[23] For example, the court in *In re Caesars Palace Securities Litigation,* 360 F.Supp. 366, 378–383 (S.D.N.Y.1973), thoroughly considered the question of the liability of aiders and abettors under § 12(2) and held that they may be sued. Noting both the "progressive expansion" of the concept of privity under § 12(2), 360 F.Supp. at 379, and the broad, remedial purpose of the securities laws, 360 F.Supp. at 382–383, the court concluded that

"it would be nothing more than an exercise in semantic hair-splitting for this Court to attempt to delineate a legally cognizable distinction between those categories of persons who have previously been exposed to liability under § 12(2) and those persons charged with aiding and abetting and conspiring in the violation of § 12(2)." 360 F.Supp. at 380.

Allowing plaintiffs to recover from those who aid and abet violations of § 206 is unquestionably consistent with the Supreme Court's admonition in *S.E.C. v. Capital Gains Bureau, supra,* 375 U.S. at 195, 84 S.Ct. 275, that courts should construe the Investment Advisers Act "not technically and restrictively, but flexibly to effectuate its remedial purposes." Indeed, one of Congress's primary motivations in amending the Act in 1960 was to provide for more flexible enforcement of § 206. S.Rep. No. 1760, *supra,* at 4. *See* H.R.Rep. No. 2179, *supra,* at 3. This Court cannot ignore that allowing recovery from only investment advisers will allow aiders and abettors to escape with their ill-gotten gains intact and often deny any meaningful recovery to injured plaintiffs. *See* Note, *supra,* note 11, 74 *Mich.L.Rev.* at 341–342. Having held that an implied private right of action exists against investment advisers under the Investment Advisers Act, this Court would be remiss in not allowing similar actions against those who aid and abet violations of § 206.[24]

### C. *Liability of Attorneys*

Defendants Sullivan & Worcester, Hand, and Wardell argue that there should be no implied damage action against attorneys who are alleged to have aided and abetted a violation of § 206, even if such an action may be brought against other non-investment advisers. They contend that the Investment Advisers Act specifically excludes attorneys from its purview, and that allowing attorneys to be sued under the Act would have serious ramifications.

Section 202(11) of the Act, 15 U.S.C. § 80b–2(11), defines investment ad-

---

**23.** *E. g., Hill York Corp. v. American Internat'l Franchises, Inc.,* 448 F.2d 680, 692–693 (5 Cir. 1971); *Lorber v. Beebe,* 407 F.Supp. 279, 287–288 (S.D.N.Y.1976); *Sandusky Land, Ltd. v. Uniplan Groups, Inc.,* 400 F.Supp. 440, 442–444 (N.D.Ohio 1975). *But cf. Dorfman v. First Boston Corporation,* 336 F.Supp. 1089, 1091–1093 (E.D.Pa.1972); *Barlas v. Bear, Stearns & Co.,* 1964–66 CCH Fed.Sec.L.Rep. ¶ 91,674 (N.D.Ill. 1966) (defendant must be in privity with or control seller).

**24.** Plaintiffs also allege that defendants conspired with CIS to violate § 206. When deciding damage actions under the securities laws, courts often fail to recognize the different elements involved in aiding and abetting and in conspiracy. Ruder, *supra* note 14, 120 *U.Pa.L.Rev.* at 620–628, 638–641. Having concluded that defendants who aid and abet in a violation of § 206 are liable to injured plaintiffs, the

Court need not reach the question of whether the same liability would attach to coconspirators. However, the Court does note that many of the same policy considerations are applicable.

Because plaintiffs allege that all defendants knowingly and willfully aided and abetted the fraudulent activities of CIS, the parties did not brief and the Court will not reach the question of whether a defendant may be held liable under the Investment Advisers Act solely as a "controlling person." *Cf.* Securities Exchange Act of 1934, § 20(a), 48 Stat. 899 (codified at 15 U.S.C. § 78t(a)) ("Every person who, directly or indirectly, controls any person liable under any provision of this chapter * * * shall also be liable * * * to the same extent as such controlled person to any person to whom such controlled person is liable * * *.").

viser as "any person who, for compensation, engages in the business of advising others * * * as to the value of securities or as to the advisability of investing in, purchasing, or selling securities * * *." The section goes on to exclude various professions and institutions from its coverage. Among those excluded are "any *lawyer, accountant, engineer, or teacher whose performance of such services is solely incidental to the practice of his profession * *.*" 15 U.S.C. § 80b–2(11)(B) (emphasis supplied). This provision, at most, exempts an attorney who, in the course of his or her normal duties, counsels a client as to the value of securities or the advisability of purchasing or selling securities. Congress did not intend § 202(11)(B) to give lawyers, accountants, engineers and teachers a free license to aid and abet fraud. In any event, no responsible counsel would argue that aiding and abetting fraud is "incidental to the practice of [law]."

There are, however, a number of legitimate criticisms of allowing attorneys to be named as aiders and abettors in securities fraud suits, the most serious of which involve potential abuses of the discovery process.[25] One of the Supreme Court's primary reasons for limiting the class of plaintiffs who may recover damages under Rule 10b–5 was to reduce "vexatious" litigation. *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 739–749, 95 S.Ct. 1917. The Court noted that an action for securities fraud often has a settlement value "out of any proportion to its prospect of success at trial," because "the very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit." 421 U.S. at 740, 95 S.Ct. at 1927. One of the most serious problems is

> "[t]he potential for possible abuse of the liberal discovery provisions of the Federal Rules of Civil Procedure * * *. The prospect of extensive deposition of the

defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents, is a common occurrence in this and similar types of litigation. * * * [T]o the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit." 421 U.S. at 741, 95 S.Ct. at 1928.

The impact of such abuses is compounded when the defendant is an individual attorney or law firm rather than a large corporation.

■ The intentional circumvention of the attorney-client privilege is a potential abuse that is unique to allowing attorneys to be sued as aiders and abettors. Ordinarily, of course, parties may not discover an opponent's confidential communications to his attorney. 4 Moore, *Federal Practice* ¶ 26.60[2] at 26–229–26–232 & n. 1 (2d Ed. 1976) (cases collected). *See* Code of Professional Responsibility DR 4–101(B)(1). An attorney may, however, reveal such communications if doing so is necessary to his defense against accusations of wrongful conduct. *Meyerhofer v. Empire Fire and Marine Insurance Co.,* 497 F.2d 1190, 1194–1195 (2 Cir.), *cert. denied,* 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974); Code of Professional Responsibility DR 4–101(C)(4).

Thus, an innocent attorney sued as an aider and abettor of his client's misconduct is faced with the unenviable choice of either revealing confidential communications or sacrificing his own defense. The prospect of obtaining potentially damaging and otherwise unavailable evidence will encourage plaintiffs to sue defendants' attorneys routinely as aiders and abettors. In addition to

---

**25.** There are, of course, other potential repercussions from allowing attorneys to be sued as aiders and abettors. Attorneys will be more wary of giving advice, attorneys' insurance premiums may rise, and some young lawyers may even be discouraged from entering the field of securities law. *See* Mathews, "Liabilities of Lawyers Under the Federal Securities Laws," 30 *Business Lawyer* 105, 105–110 (Special Issue 1975).

causing attorneys great nuisance and expense, such a development could seriously undermine the willingness of clients to be completely open with their counsel.

 While allowing attorneys to be sued as aiders and abettors has significant drawbacks, the alternative is even less desirable. In the case at bar, plaintiffs allege that defendants knowingly and willfully participated in fraud. This Court will not immunize attorneys from liability under the Investment Advisers Act for such wrongdoing. "The legal profession plays a unique and pivotal role in the effective implementation of the securities laws," and must be held accountable accordingly. *S.E.C. v. Spectrum, Ltd.,* 489 F.2d 535, 541–542 (2 Cir. 1973). The fact that defendant attorneys received no financial reward in addition to their normal legal fees does not absolve them of responsibility under the securities laws. *See S.E.C. v. North American R. D. Corp.,* 424 F.2d 63, 81 (2 Cir. 1970). As Judge Friendly observed in *United States v. Benjamin,* 328 F.2d 854, 863 (2 Cir.), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964), "In our complex society the accountant's certificate and the lawyer's opinion can be instruments for inflicting pecuniary loss more potent than the chisel or the crowbar."

 The attorney-client privilege was never intended to shield the fraudulent activities of an attorney and his client:

"The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (Cardozo, J.).

*Accord, United States v. Shewfelt,* 455 F.2d 836, 840 (9 Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2042, 32 L.Ed.2d 231 (1972) (cases collected). If the attorney-client privilege does not shield communications relating to fraud, it certainly should not be construed to protect attorneys from liability for aiding their clients in the perpetration of that fraud.

Although individuals sue less frequently under the Investment Advisers Act than other securities laws, the Court is still concerned about the potential abuse of discovery discussed *supra.* The proper solution, however, lies in the control by the Court of the discovery process, not the dismissal of all aiding and abetting claims against attorneys.

Accordingly, IT IS HEREBY ORDERED that defendants' motions to dismiss plaintiffs' claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 are granted.

IT IS HEREBY FURTHER ORDERED that defendants' motions to dismiss plaintiffs' claims under the Investment Advisers Act of 1940 are denied.

IT IS HEREBY FURTHER ORDERED that all parties shall appear before this Court at 9 A.M. on Thursday, April 21, 1977, for a further status report with respect to discovery.