**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**John FORMA, Vincent Forma, Peter Aaron, Gerhard Meilen and Thomas Boccieri, Defendants.**

**No. 85 Civ. 3820 (CSH).**

United States District Court, S.D. New York.

Oct. 23, 1987.

Kathleen A. Warwick, Regional Adm'r., S.E.C. by Anne C. Flannery, Kimberly C. Lawrence, LaBrena J. Martin, Carmen J. Lawrence, New York City, for plaintiff.

Lowy & Chernis, P.C. by Paul Chernis, New York City, for defendant John Forma.

Weil, Gotshal & Manges by Nancy E. Barton, New York City, for defendant Gerhard Meilen.

## MEMORANDUM AND ORDER

JAMES C. FRANCIS, IV, United States Magistrate.

This is an enforcement action brought by the Securities and Exchange Commission ("SEC") charging the defendants with various securities law violations in connection with British American Petroleum Corporation ("BAP"). At the relevant times, defendant John Forma was chairman of the board of directors and majority shareholder of BAP. His brother, Vincent Forma, performed certain duties for BAP and was assistant to the chairman. Peter Aaron was BAP's executive vice president, Gerhard Meilen was general counsel and corporate secretary, and Thomas Boccieri was

assistant general counsel and compliance officer.[1]

The complaint charges that John Forma, aided and abetted by Gerhard Meilen, sold unregistered securities in violation of 15 U.S.C. §§ 77e(a) and 77e(c). Complaint, paras. 33–36. It further charges John Forma and Thomas Boccieri with aiding and abetting BAP in acting as an unregistered broker-dealer in violation of 15 U.S.C. § 78o(a)(1) and § 78o(b)(7). *Id.* at paras. 37–44. The complaint also alleges that John Forma, aided and abetted by defendants Meilen and Boccieri, violated the antifraud provisions of 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3), by failing to disclose in connection with the sale of BAP securities the history of previous SEC enforcement actions against Mr. Forma. *Id.* at paras. 59–62.[2]

John Forma now moves to suppress evidence flowing from the deposition testimony of Jeffrey Tucker, former outside counsel to Mr. Forma and BAP. Prior to the filing of the complaint, the SEC took the testimony of Mr. Tucker after he had obtained a written waiver of the attorney-client privilege from Mr. Forma. Mr. Forma now challenges that waiver as the product of misconduct by the SEC. He argues that the SEC coerced Mr. Tucker into obtaining the waiver by subjecting him to investigation when there was an inadequate factual basis for doing so. The SEC defends its conduct and cross-moves for an order compelling Mr. Forma to testify about his discussions with Mr. Tucker without invoking the attorney-client privilege.

Because these motions present disputed factual issues, an evidentiary hearing was held. For the reasons set forth below, I find that the SEC had an adequate factual and legal basis for seeking the testimony of Jeffrey Tucker. Mr. Tucker then obtained from Mr. Forma a knowing and voluntary waiver of the attorney-client privilege. Moreover, even if there had been no explicit waiver, Mr. Tucker would have been entitled to testify pursuant to the self-defense exception to the privilege. Accordingly, Mr. Forma's motion is denied and the SEC's cross-motion is granted.

*Factual Background*

The SEC first began investigating BAP in 1980. (Tr. 72–73).[3] In connection with that investigation, Jeffrey Tucker represented both John Forma and BAP. (Tr. 73–75, 144). When the SEC initiated a new investigation in 1984, Mr. Tucker again represented Mr. Forma and BAP at the outset, as well as Mr. Meilen and Mr. Boccieri. (Tr. 78, 144, ex. N. (letter dated July 6, 1984)).[4] The SEC took testimony from Mr. Meilen and Mr. Boccieri in January, 1984. (Ex. U–1–a, U–2–a). In June or July, the staff of the SEC's New York Regional Office decided to recommend commencement of an enforcement action, and on July 6, 1984, the SEC advised Mr. Tucker that the complaint would name his clients BAP, Mr. Forma, Mr. Meilen, and Mr. Boccieri as defendants. (Tr. 259; ex. N (letter dated July 6, 1984)). The SEC invited the proposed defendants to make "Wells Committee" submissions, which are memoranda to the SEC presenting arguments why an enforcement proceeding should not be brought against a potential defendant. (Ex. N). Both Mr. Boccieri and Mr. Meilen presented Wells submissions (Ex. W–1, W–2), and both presented further testimony to the SEC. It is on the basis of the evidence proffered by these witnesses that the SEC sought testimony from Jeffrey Tucker. (Tr. 450–58).

The SEC sought information from Mr. Tucker in three areas, the first being Mr. Forma's alleged sale of unregistered securities. (Ex. A). During his testimony before the SEC on August 7, 1984, Mr. Boccieri testified that he had learned about sales of Mr. Forma's stock and had discussed

---

**1.** Pursuant to stipulations of settlement, the claims against Vincent Forma and Thomas Boccieri have been dismissed.

**2.** The complaint also asserts additional claims not relevant to the instant motion.

**3.** "Tr." refers to the transcript of the evidentiary hearing held July 21–23, 1987.

**4.** Unless otherwise indicated, all exhibits referred to were admitted into evidence at the evidentiary hearing.

this issue with Mr. Forma himself, with Mr. Meilen, and with Mr. Tucker (Ex. U–1–b at 147–49). Mr. Boccieri did not recall Mr. Tucker indicating that he had been aware of the sales prior to their completion. (Ex. U–1–b at 153). However, Mr. Boccieri's testimony about when he himself learned of the sales and discussed them with Mr. Tucker was ambiguous. (Ex. U–1–b at 147–49, 152–53; ex. U–1–d at 308).

Mr. Meilen's Wells submission provides a further suggestion that Mr. Tucker might have had some culpability in the sale of unregistered stock. Mr. Meilen alleged that when he confronted Mr. Forma about the sales, Mr. Forma said that he had "consulted with his counsel" about them. (Ex. W–2 at 6 n. 1). The SEC knew that Mr. Tucker had served as outside counsel to Mr. Forma since at least 1980. In his testimony on October 25, 1984, Mr. Meilen reiterated that Mr. Forma had claimed to have obtained assurances of the legality of his sales of stock, though now Mr. Meilen was not sure if Mr. Forma had specifically referred to "outside counsel." (Ex. U–2–b at 147–48).

The SEC also sought to elicit testimony from Mr. Tucker concerning the allegation that BAP had functioned as an unregistered broker-dealer in its sale of limited partnership interests. The basis for inquiring into this area came, in part, from the testimony of Mr. Boccieri on August 7, 1984. At that time, Mr. Boccieri described how Mr. Tucker had advised him in 1981 that the transactions in question involved securities and therefore had to be performed by a registered broker-dealer. (Ex. U–1–b at 101, 134). However, the entity that would act as a broker-dealer, BAP Management, was not operative until approximately July of 1983. (Ex. U–1–b at 128).

In testimony on October 24, 1984, Mr. Meilen confirmed that Mr. Tucker had stated that it was necessary for BAP to have a registered broker-dealer. (Ex. U–2–b at 89, 92). Mr. Meilen did not know whether Mr. Tucker played any role in insuring that a registered broker-dealer was in place. (Ex. U–2–b at 97). He did say, however, that Mr. Tucker had on several occasions stressed the need to expedite the process of obtaining a registered broker-dealer. (Ex. U–2–b at 103–04). From this, it could be fairly inferred that Mr. Tucker knew that there were ongoing transactions for which a registered broker-dealer was necessary but not yet operative.

The third subject area about which the SEC wished to examine Mr. Tucker was the failure to disclose, in connection with the sale of BAP securities, the fact that John Forma had previously been barred from association with broker-dealers. The SEC knew from the August, 1984 testimony of Mr. Boccieri that he and Mr. Forma had discussed with Mr. Tucker the possibility of getting an opinion of counsel on whether such disclosure was required. (Ex. U–1–c at 170–71). Mr. Tucker's firm did not render such advice, both because there was doubt whether it could provide a favorable opinion and because it anticipated representing BAP in the public offering. (Ex. U–1–c at 172; Ex. T). BAP did engage an attorney named James Jones to issue an opinion, and Mr. Boccieri testified that he referred him to Mr. Tucker's firm for information. (Ex. U–1–c at 179). Although Mr. Boccieri believed that Mr. Jones did contact Mr. Tucker (Ex. U–1–c at 180), Mr. Jones denied this in his testimony before the SEC in October, 1984. (Ex. U–3 at 49–51, 142–43). The opinion letter issued by Mr. Jones suggested that BAP no longer needed to disclose Mr. Forma's administrative bar. (Ex. C, attachment).

In addition to this information regarding Mr. Tucker's possible liability, the SEC was aware of two prior episodes concerning this attorney. The first occurred when Mr. Tucker was himself an attorney for the SEC. An indictment for securities fraud was dismissed by the district court on grounds that Mr. Tucker and another attorney had misled the defendant into believing that there was an agreement not to prosecute. (Tr. 184–85, 330–31). Although it characterized Mr. Tucker's conduct as improper, the Second Circuit later reversed this decision and reinstated the indictment. (Tr. 184, 331). *See United States v. Fields*, 592 F.2d 638, 647 (2d Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.

2d 284 (1979). The second incident involved a conflict of interest in Mr. Tucker's representation of an entity called Brent Equities. (Tr. 187–93, 329–30). The SEC considered barring Mr. Tucker from practicing before it, but it did not do so. (Tr. 329). Instead, it referred the matter to the disciplinary committee of the New York State Bar Association which issued a letter of reprimand. (Tr. 192–93).

On October 5, 1984, members of the SEC staff, including Anne Flannery, met with Mr. Tucker. (Tr. 106–07, 315). At that time they stated their desire to take his testimony in connection with BAP, and they outlined the three subject areas of concern: the sale of unregistered securities, the failure to disclose Mr. Forma's prior administrative bar, and BAP's operation as an unregistered broker-dealer. (Tr. 115, 316–19). Mr. Tucker expressed surprise at the suggestion that he might have been involved in the sale of unregistered securities. (Tr. 115–17, 316–18). Without providing specific details, the staff advised Mr. Tucker that it had received conflicting information that raised questions about his role in all three areas. (Tr. 110–14, 320–21). When Mr. Tucker asked if he was a target, Ms. Flannery responded that she could not answer the question directly. (Tr. 320). She did state, however, that he was not merely a fact witness and should assume the worst. (Tr. 320–21). Although Mr. Tucker felt he would ultimately be vindicated, he did believe at the time of the October 5 meeting that he might be named as a defendant. (Tr. 117–19, 169–70).

On October 22, 1984, Mr. Tucker again met with SEC staff members, including Ms. Flannery and Ira Lee Sorkin, the regional administrator. (Tr. 235–41, 327). At that meeting, the staff rejected Mr. Tucker's request that his testimony not be transcribed. (Tr. 235–36, 327). Mr. Tucker also asked that the questioning be limited to the three areas outlined by the SEC and not delve into his background. (Tr. 327–28). The SEC acknowledged this request but indicated that it would not circumscribe its investigation. (Ex. 1).

In connection with his anticipated testimony, Mr. Tucker sought a waiver of the attorney-client privilege from Mr. Forma. The testimony of these two witnesses concerning the obtaining of the waiver is at odds in certain respects. According to Mr. Forma, Mr. Tucker arrived unannounced at his office and asked for the waiver, stating that he would testify whether or not the waiver was executed. (Tr. 57, 68, 80–82). When asked if the waiver would damage Mr. Forma's legal position, Mr. Tucker replied that it would probably facilitate settlement with the SEC. (Tr. 57). They did not discuss the possibility of Mr. Forma's obtaining new counsel. (Tr. 63–64). Mr. Forma agreed to waive the attorney-client privilege, and Mr. Tucker dictated a letter to Mr. Forma's secretary. (Tr. 80).

Mr. Tucker testified that he contacted Mr. Forma by telephone to discuss the waiver. (Tr. 217). When Mr. Forma asked if the waiver would assist Mr. Meilen and Mr. Boccieri, Mr. Tucker replied that it would probably not have much effect on any of the three proposed defendants, though it might facilitate settlement. (Tr. 127–28). Mr. Tucker advised Mr. Forma that testimony Tucker gave could be used in any case against Forma. (Tr. 129–30). Mr. Tucker also advised Mr. Forma that he did not believe that the attorney-client privilege barred his testimony since he himself was under investigation. (Tr. 164). In view of his anticipated testimony, Mr. Tucker stated that he could not represent Mr. Forma while his own conduct was being scrutinized. (Tr. 130). However, Mr. Forma indicated a desire not to seek new counsel, since the need to do so would be obviated if the investigation of Mr. Tucker were favorably resolved. (Tr. 130–31). Mr. Forma agreed to execute a waiver, and Mr. Tucker prepared a draft and transmitted it to Mr. Forma's office where it was typed on BAP letterhead. (Tr. 132–33, Ex. A).

The waiver signed by John Forma permitted Mr. Tucker's testimony in the three areas identified by the SEC. (Ex. A). On October 30, 1984, Mr. Tucker testified concerning these matters and regarding other issues that he believed were not privileged.

(Tr. 133–34). Thereafter, Mr. Tucker discussed his testimony with Mr. Forma. (Tr. 136). In late November, 1984, the SEC advised Mr. Tucker that it was no longer pursuing its investigation of his activities with BAP, and Mr. Forma expressed pleasure at this news. (Tr. 137–38).

Mr. Forma and Mr. Tucker had no communications concerning waiver of the attorney-client privilege between the time of Mr. Tucker's testimony and February of 1985. Nevertheless, according to Mr. Forma, the problem of the waiver continued to bother him throughout this period. (Tr. 83). Then, by letter dated February 15, 1985, the SEC staff advised Mr. Tucker that it would recommend filing a lawsuit against Mr. Forma. (Ex. K). Paul Chernis then advised the SEC in a letter dated February 21, 1987, that he had been retained to represent Mr. Forma and that the waiver of the attorney-client privilege was rescinded. (Ex. D). At about this time, Mr. Forma wrote to Mr. Tucker, advising him that he had retained Mr. Chernis as his new counsel. In his undated letter, Mr. Forma stated, "When you asked me to waive the attorney-client privelege [sic] and in fact, told me that if I refused, you would testify to confidential communications anyway, I felt left out in the cold." (Ex. I). By letter dated March 7, 1985, Mr. Tucker responded, disputing Mr. Forma's characterization of the circumstances surrounding the waiver. He set forth a description of his request for the waiver consistent with his testimony in the hearing in this case, and he reiterated his belief that the attorney-client privilege was inapplicable because his own conduct was being investigated. (Ex. J).

*Discussion*

### A. *Applicability of the Privilege*

■ In *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357 (D.Mass. 1950), Judge Wyzanski articulated the standard for determining whether a communication is protected by the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort, and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Id.* at 358–59. In this case, the SEC contends that Mr. Forma's discussions with Mr. Tucker fail to meet one requirement of this multi-part test. According to the SEC, Mr. Tucker represented not Mr. Forma but BAP. Thus, Mr. Forma was acting as an official of BAP in seeking Mr. Tucker's advice, and although BAP might have been able to assert the attorney-client privilege, it had waived it.

The evidence, however, does not support this argument. Mr. Tucker had represented both Mr. Forma and BAP over a substantial period. Some of the issues on which Mr. Forma sought Mr. Tucker's advice—such as Mr. Forma's sale of his own stock—are clearly personal rather than corporate matters. Both Mr. Forma and Mr. Tucker understood that they had established an attorney-client relationship. Finally, the SEC understood this as well, as evidenced by its efforts to secure a waiver of the attorney-client privilege from both BAP and John Forma before taking the testimony of Mr. Tucker. Thus, the attorney-client privilege protected communications between Mr. Forma and Mr. Tucker, and it must be determined whether the SEC properly pierced the privilege.

### B. *Suppression as a Remedy*

■ It has not yet been decided whether the attorney-client privilege has a constitutional dimension such that evidence obtained by breaching the privilege must be excluded. *See Hirschfeld v. Securities and Exchange Commission,* 617 F.Supp. 262 (D.D.C.1985); *Securities and Ex-*

*change Commission v. Gulf & Western Industries, Inc.*, 502 F.Supp. 343, 346 n. 5 (D.D.C.1980). Yet, even if the impropriety alleged here did not impinge upon constitutional rights, the remedy of suppression of evidence could be appropriate. Courts may utilize their supervisory powers to exclude evidence obtained through means which, although constitutionally permissible, violate important policy considerations. *See United States v. Jacobs*, 547 F.2d 772 (2d Cir.1976).

■ Moreover, Rule 501 of the Federal Rules of Evidence requires that federal courts apply common law privileges in cases based upon federal substantive law. Thus, evidence obtained in violation of the attorney-client privilege may be suppressed simply because its admission would violate the rules of evidence. *See United States v. Sindona*, 636 F.2d 792, 805 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). Thus, if Mr. Tucker's breach of the attorney-client privilege was the result of misconduct by the SEC, suppression of his testimony would be required.

### C. Implied Waiver

■ The SEC argues, however, that regardless of the validity of its actions and of Mr. Forma's initial waiver of the privilege, he has now impliedly waived it by asserting a defense of reliance upon counsel. Indeed, it is well established that a defendant cannot claim that the assurances of counsel protect him from liability and at the same time preclude discovery of attorney-client communications related to that advice. In such circumstances, the defendant is deemed to have impliedly waived the privilege. *See, e.g., Haymes v. Smith*, 73 F.R. D. 572, 577 (W.D.N.Y.1976); *Handgards, Inc. v. Johnson & Johnson*, 413 F.Supp.

926, 929 (N.D.Cal.1976); *Garfinkle v. Arcata National Corp.*, 64 F.R.D. 688, 689 (S.D.N.Y.1974).

Nevertheless, parties are entitled to plead in the alternative pursuant to Rule 8(e) of the Federal Rules of Civil Procedure. Because the reliance on counsel defense will result in the disclosure of privileged communications, defendants should first be permitted to test the validity of other defenses. This principle applies with special force in the instant case. John Forma contends that the case against him depends upon the testimony of Jeffrey Tucker, evidence allegedly secured by SEC misconduct. It would thus be patently unfair to permit the SEC to use improperly obtained evidence to force Mr. Forma to advance a reliance on counsel defense and then use that defense to prevent him from challenging the evidence. *Cf. Chase Manhattan Bank, N.A. v. Drysdale Securities Corp.*, 587 F.Supp. 57, 58–59 (S.D.N.Y. 1984) (no implied waiver where opposing party's pleading raises issue of reliance on counsel).[5]

### D. Actual Waiver

#### 1. Voluntariness

■ John Forma's execution of a waiver of the attorney-client privilege is not dispositive. A waiver coerced by governmental officials may be involuntary and therefore invalid. *See Teachers Insurance and Annuity Association of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638, 641–42 (S.D.N.Y.1981). Furthermore, deception as well as actual coercion by the government may nullify a waiver. *See United States v. Miller*, 660 F.2d 563, 568–69 (5th Cir.1981), *vacated as moot*, 685 F.2d 123 (5th Cir.1982). Here, John Forma argues that the SEC pressured his attorney

---

**5.** This holding that Mr. Forma has made no general implied waiver regarding communications with Mr. Tucker does not address the more difficult question of whether his alleged reliance on Mr. Meilen or Mr. Boccieri waives the privilege with respect to discussions with other counsel. For example, if Mr. Forma asserts that he relied on the advice of these attorneys with respect to a particular issue, advice he received from Mr. Tucker on that matter may

also be subject to discovery even if Mr. Forma does not claim to have relied on him. Otherwise, a claim of reliance on counsel would be immune from a showing that, in fact, the defendant had received overwhelming advice to the contrary. However, in light of the validity of Mr. Forma's actual waiver of the attorney-client privilege, the precise scope of any residual implied waiver need not be determined.

to secure a waiver that was then used to obtain incriminating evidence from the lawyer. The danger that the SEC can thus attack a defendant by charging his attorney as an aider and abettor has been frequently noted. *See, e.g., First Federal Savings & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 110 F.R.D. 557, 566 (S.D.N.Y.1986) ("*First Federal*"); *Sullivan v. Chase Investment Services of Boston, Inc.,* 434 F.Supp. 171, 188–89 (N.D.Cal.1977).

■ However, in this case the potential for abuse by the SEC was not realized. First, John Forma's waiver of the attorney-client privilege was voluntary in the sense that it was an intentional, considered act. The evidence establishes that he understood that the waiver would result in Mr. Tucker's disclosure of confidential communications. Mr. Forma weighed relevant considerations before making his decision, including the impact that it would have on his own case, on that of his proposed co-defendants Mr. Meilen and Mr. Boccieri, and on the investigation of Mr. Tucker.

Mr. Forma's assertion that he was misled by Mr. Tucker is not credible. Mr. Tucker's representation that refusing the waiver might hurt prospects for settlement was plausible. His statement that the attorney-client privilege did not attach and that he would be required to testify even without a waiver was well-founded, as will be discussed below. Moreover, Mr. Tucker was forthright about his own interest in obtaining a waiver. Finally, the limited nature of the waiver that he drafted demonstrates the objectivity of Mr. Tucker's advice: had he wished to ingratiate himself with the SEC he could as easily have sought a blanket waiver.

Accordingly, I find no evidence that Mr. Forma's decision was improperly influenced by Mr. Tucker's own sense of jeopardy. Mr. Forma's statement that he would have rejected the waiver if he had received complete and impartial advice is based solely on his dissatisfaction with the outcome. He expressed no discomfort about the waiver until the SEC had reiterated its intention to name him as a defendant, thus dashing any hope of an early settlement. Only after that, and after he had sought advice from new counsel, did Mr. Forma articulate any disagreement with the waiver.

### 2. *Self–Defense Exception*

At the same time, Mr. Tucker was correct in advising Mr. Forma that the self-defense exception to the attorney-client privilege applied. Thus, Mr. Tucker did not mislead Mr. Forma in this respect, and even if Mr. Forma had not executed the waiver, Mr. Tucker would have been entitled to reveal confidential communications.

■ The self-defense doctrine permits an attorney to disclose attorney-client communications in order to defend himself against accusations of wrongful conduct. *Meyerhofer v. Empire Fire and Marine Insurance Co.,* 497 F.2d 1190, 1194–95 (2d Cir.), *cert. denied,* 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974); *First Federal,* 110 F.R.D. at 563–66. Here, Mr. Tucker had not yet been named as a defendant in any proceeding when he sought the waiver from Mr. Forma. However, formal charges need not have been issued for the self-defense exception to apply. For example, in *In re Friend,* 411 F.Supp. 776, 777 n. * (S.D.N.Y.1975), the court held that an attorney under investigation by a grand jury could disclose client confidences because "it would be senseless to require the stigma of an indictment to attach" before allowing the lawyer to invoke the self-defense doctrine. Similarly, in *Rosen v. N.L.R.B.,* 735 F.2d 564, 576 (D.C.Cir.1984), the court suggested that an attorney could testify about privileged communications merely because of an accusation in an administrative hearing that he had solicited false testimony; there was no hint that any formal proceedings against the lawyer were contemplated. Here, Jeffrey Tucker was entitled to invoke the self-defense doctrine during the SEC investigation. Requiring him to wait until he was named as a defendant would have required him to expend substantial resources in his defense, tarnished his professional reputation, and

threatened his livelihood as a securities lawyer.

■ Yet under these circumstances it is not sufficient merely to observe that Jeffrey Tucker stood accused. There must have existed some objective factual basis for the allegation. Otherwise, the SEC could elicit testimony from lawyers incriminating their clients merely by charging the attorneys, without foundation, as aiders and abetters. Furthermore, it is not sufficient for the agency to have proceeded in subjective good faith. First, state of mind proof is difficult to elicit and intrudes into the workings of the agency. Second, the attorney-client privilege is too important to be breached by innocent but wrongheaded agency actions that cause a vulnerable attorney to disclose confidential communications. Therefore, as in other contexts where evidence is sought to be suppressed, the decision here should be guided by an objective determination of whether there was a factual basis for seeking Mr. Tucker's testimony. *See, e.g., United States v. Ginsberg*, 758 F.2d 823, 828–29 (2d Cir. 1985) (objective basis for testing admissibility of evidence derived from warrantless arrest).

■ There remains the issue of the quantum of evidence necessary before an agency investigation of an attorney may breach the attorney-client privilege. For example, an agency might be required to demonstrate that it had probable cause to believe that the attorney was engaged in illegal activity. The probable cause standard, which must be met before a criminal defendant is arrested, requires that there be sufficiently trustworthy information to warrant a reasonably cautious person to believe that an illegal act has occurred and that the defendant committed it. *Id.* at 828. An alternative standard, and one less demanding than probable cause, is the reasonable suspicion test that must be met when police officers subject someone to an "investigatory stop." *See Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968); *United States v. Ceballos*, 654 F.2d 177, 180–81 (2d Cir.1981). Finally, in *First Federal*, the court sug-

gested a still less stringent standard for determining whether there is sufficient evidence to trigger an attorney's right to defend himself. There, an attorney was required to disclose confidential client communications because accusations that he was aiding and abetting the client's fraud were "not pretextual" and were not so frivolous as to invite sanctions under Rule 11 of the Federal Rules of Civil Procedure. 110 F.R.D. at 566 & n. 15.

In *Terry v. Ohio*, the Supreme Court analyzed the quantum of evidence necessary to justify a search and seizure by balancing the nature of the governmental interest against the extent of the intrusion on the individual's rights. 392 U.S. at 20–27, 88 S.Ct. at 1879–83. A similar balancing is appropriate here. The government's interest in investigating securities fraud—and specifically attorney involvement in such fraud—must be measured against the sanctity of the attorney-client relationship. Here, two considerations make it inappropriate to require an agency to demonstrate probable cause prior to seeking the testimony of an attorney. First, the intrusion at issue here is much less egregious than that attendant to an arrest. Second, because the attorney-client privilege results in depriving the court of evidence, it should be narrowly construed. *See* 8 Wigmore, *Evidence* § 2291 at 554 (McNaughton rev. 1961). On the other hand, violation of the attorney-client privilege inhibits free access to legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981); *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Since this consequence is more significant than the waste of resources that accompanies pretextual pleadings or frivolous lawsuits, a showing that an accusation against an attorney is "not pretextual" is not sufficient to relieve the attorney of the obligation of preserving client confidences.

The best balance here is one that addresses the unique relationship of attorney and client. There will always be some suspicion that a client who engages in illegal

activity in a heavily regulated industry may be aided and abetted by his attorney. But before an attorney can reveal confidential client information, the investigating agency must have facts supporting a reasonable suspicion that the attorney's involvement exceeded that of counsel legitimately providing legal advice and instead constituted illegal activity.

■ In order to establish secondary liability for a securities law violation, a plaintiff must prove: (1) a securities law violation by the primary wrongdoer, (2) knowledge of the violation by the alleged aider and abetter, and (3) substantial assistance by the aider and abetter in the achievement of the primary violation. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980). In appropriate circumstances, an attorney can be subject to liability for aiding and abetting. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62–63 (2d Cir.1985) (action against law firm dismissed for lack of causation); *Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1244–45 (S.D.N.Y.1984) (complaint against attorney dismissed for lack of scienter and substantial assistance). Although an attorney cannot be held liable merely for failing to "tattle" on his clients, *see Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986), silence consciously intended to facilitate a fraud can create secondary liability. *See Armstrong v. McAlpin,* 699 F.2d at 91; *Whitbread (US) Holdings, Inc. v. Baron Philippe De Rothschild, S.A.,* 630 F.Supp. 972, 982–83 (S.D.N.Y.1986); *Quintel Corp. v. Citibank, N.A.,* 589 F.Supp. at 1245.

■ Application of these standards in the instant case supports the SEC's claim that it had a reasonable suspicion that Jeffrey Tucker had aided and abetted alleged violations of the securities laws. There is no dispute that the SEC had a basis for believing that the primary violations occurred, and the agency's information was likewise sufficient to support the view that the scienter and substantial assistance requirements were also met with respect to Jeffrey Tucker's involvement in each of the three areas under investigation.

The SEC staff had information, for example, that Mr. Tucker was aware of Mr. Forma's sale of unregistered securities. On the basis of Mr. Meilen's Wells submission, the SEC could reasonably suspect that Mr. Tucker did not merely obtain this information when the sales were completed, but rather assisted Mr. Forma in executing them. Similarly, there was sufficient evidence for the SEC to believe that Mr. Tucker had had some active responsibility for sales for which he had acknowledged that a broker-dealer was necessary but for which none was then operative. There was a basis for suspicion both that he knew of this situation and that his role with BAP extended beyond giving advice and included the preparation of documents used to effect transactions. Finally, the SEC knew that Mr. Tucker declined to render an opinion on the need to disclose Mr. Forma's administrative bar and that James Jones did provide an opinion, supposedly after obtaining information from Mr. Forma. Although Mr. Jones denied discussing this with Mr. Forma, the SEC was not bound to accept his testimony as conclusive, and it still had reason to suspect that the Jones opinion was based on false information supplied by Mr. Tucker. The SEC, then, had a reasonable suspicion that Mr. Tucker's involvement in each of these alleged illegal activities was more extensive than that of counsel providing objective legal advice. Accordingly, it was proper for Mr. Tucker to reveal discussions with Mr. Forma under the self-defense exception to the attorney-client privilege.[6]

### E. *Prescription*

■ As is evident from this determination, it is possible for an agency to breach the attorney-client privilege and then secure a ruling validating its action. However, this course has two pitfalls. First, if the agency is wrong and the violation of

---

**6.** In view of this holding, there is no need to address the SEC's alternative argument that Mr. Tucker's testimony was properly elicited under the crime/fraud exception to the attorney-client privilege.

the privilege is found to have been improper, the agency risks suppression of *all* evidence attributable to the breach, not merely the direct testimony of the attorney. Second, the need for collateral litigation expends resources and delays resolution of the case.

Two alternative courses would avoid these problems. The agency can, of course, seek judicial approval before seeking to breach the attorney-client privilege. *See First Federal*, 110 F.R.D. at 566 (disclosure of privileged information should ordinarily occur under court supervision). A less onerous safeguard would be to instruct the client to obtain advice of an attorney not under investigation before waiving the privilege. Any claim that the waiver had been obtained through improper pressure would then be precluded.

*Conclusion*

For the reasons set forth above, the motion of defendant John Forma to suppress the testimony of Jeffrey Tucker is denied. The cross-motion of the SEC to compel John Forma to give deposition testimony without asserting the attorney-client privilege is granted.

SO ORDERED.